**Michael B. Merchant**, OSB No. 882680
mike.merchant@bhlaw.com
BLACK HELTERLINE LLP
805 S.W. Broadway, Suite 2600
Portland, OR 97205
Telephone: (503) 224-5560
Facsimile: (503) 224-6148

*Liaison Counsel for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

| | |
|---|---|
| LISA CHADWICK, Derivatively on Behalf of DIGIMARC CORPORATION,<br><br>                Plaintiff,<br><br>    v.<br><br>RILEY MCCORMACK, CHARLES BECK, LASHONDA ANDERSON-WILLIAMS, SHEILA CHESTON, SANDEEP DADLANI, KATIE KOOL, DANA MCILWAIN, MICHAEL PARK, and MILENA ALBERTI-PEREZ,<br><br>                Defendants,<br><br>  and<br><br>DIGIMARC CORPORATION,<br><br>                Nominal Defendant. | Case No. 3:25-cv-01838<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>15 U.S.C. § 78(j); 17 C.F.R. § 240.10b-5; Breach of Fiduciary Duty; Unjust Enrichment; Waste of Corporate Assets<br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Lisa Chadwick ("Plaintiff"), by and through her undersigned attorneys, brings

this verified stockholder derivative action on behalf of nominal defendant Digimarc Corporation

Page 1 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

("Digimarc" or the "Company"), against certain of the Company's executive officers and its Board of Directors (the "Board") for breaches of fiduciary duties and violations of federal law by the Individual Defendants (defined below). Plaintiff's allegations are based on personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based on, *inter alia*: the investigation conducted by his counsel, including the review of publicly available information regarding the Company; the allegations of a class action complaint filed in the securities class action captioned *Ullom v. Digimarc Corporation et al.*, Case No. 3:25-cv-00779-JR (D. Or. May 8, 2025) (the "Securities Class Action"); conference call transcripts and announcements; filings with the United States Securities and Exchange Commission (the "SEC"); press releases disseminated by Digimarc; legal filings; news reports; and securities analysts' reports about the Company.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Digimarc against the Individual Defendants, certain of Digimarc's officers and directors, seeking to remedy their violations of federal law and breaches of fiduciary duty that have occurred from at least May 3, 2024 to February 26, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Digimarc.

2.      Digimarc is a technology company that specializes in digital watermarking and data identification solutions. The Company's technology has applications in product packaging, inventory tracking, anti-counterfeiting, and retail.

3.      Throughout the Relevant Period, Company management issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) one of the

Company's major commercial partners would not renew a significant contract under its existing terms; (ii) consequently, the Company was forced to renegotiate the terms of the contract, leading to a substantial reduction in Digimarc's subscription revenue and annual recurring revenue; and (iii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

4.    The truth emerged on February 26, 2025, when the Company announced disappointing fourth quarter and full year 2024 financial results. Specifically, Digimarc reported a 10% decline year-over-year in quarterly subscription revenue and a 10% decline in annual recurring revenue from the prior year. Digimarc attributed the disappointing financial results to a "$5.8 million decrease in ARR due to the expiration of a commercial contract in June 2024."

5.    On this news, the price of Digimarc stock declined 43.1% in one day, from a close of $27.01 per share on February 26, 2025 to a close of $15.39 per share on February 27, 2025.

6.    As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself and, potentially, incurring class-wide damages in the Securities Class Action, as well as additional losses in market capitalization, reputational harm, and the loss of goodwill.

7.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess

the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

9.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a).

11.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

Page 4 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

14.    Venue is proper in this district pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. §1391 because Defendants have conducted business in this District, the Company is incorporated in this District and maintains its principal executive offices in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District. Further, the Securities Class Action is currently pending in this District.

## PARTIES

### Plaintiff

15.    Plaintiff is, and has been at all relevant times, a shareholder of Digimarc.

### Nominal Defendant

16.    Nominal Defendant Digimarc is incorporated under the laws of Oregon, with its principal executive offices located at 8500 SW Creekside Place, Beaverton, Oregon 97008. Digimarc common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "DMRC."

### Individual Defendants

17.    Defendant Riley McCormack ("McCormack") has served as a member of the Board since October 2020 and as Digimarc's President and Chief Executive Officer ("CEO") since April 2021. Defendant McCormack is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant McCormack received $2,127,797 in 2024 in compensation from the Company. As of March 12, 2025, Defendant McCormack beneficially owned 3,804,899 shares of Digimarc common stock, worth roughly $56.5 million[1] and constituting 17.7% of the Company's total outstanding shares.

---

[1] Valuations of the Individual Defendants' personal holdings of Company stock are based on the $14.84 per share closing price of Digimarc stock on March 12, 2025.

18.    Defendant LaShonda Anderson-Williams ("Anderson-Williams") has served as a member of the Board since June 2023. According to the Company's public filings, Defendant Anderson-Williams received $158,367 in 2024 in compensation from the Company. As of March 12, 2025, Defendant Anderson-Williams beneficially owned 14,591 shares of Digimarc common stock, worth roughly $216,530.

19.    Defendant Sheila Cheston ("Cheston") has served as a member of the Board since October 2024 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Cheston received $280,557 in 2024 in compensation from the Company. As of March 12, 2025, Defendant Cheston beneficially owned 10,239 shares of Digimarc common stock, worth roughly $151,947.

20.    Defendant Sandeep Dadlani ("Dadlani") has served as a member of the Board since March 2021 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Dadlani received $150,002 in 2024 in compensation from the Company. As of March 12, 2025, Defendant Dadlani beneficially owned 27,323 shares of Digimarc common stock, worth roughly $405,473.

21.    Defendant Katie Kool ("Kool") has served as a member of the Board since March 2022 and served as a member of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Kool received $187,310 in 2024 in compensation from the Company. As of March 12, 2025, Defendant Kool beneficially owned 24,938 shares of Digimarc common stock, worth roughly $370,080.

22.    Defendant Dana Mcilwain ("Mcilwain") has served as a member of the Board since October 2024 and served as Chair of the Audit Committee during the Relevant Period. According to the Company's public filings, Defendant Mcilwain received $280,557 in 2024 in

compensation from the Company. As of March 12, 2025, Defendant Mcilwain beneficially owned 10,405 shares of Digimarc common stock, worth roughly $154,410.

23.    Defendant Michael Park ("Park") has served as a member of the Board since January 2024. According to the Company's public filings, Defendant Park received $391,627 in 2024 in compensation from the Company. As of March 12, 2025, Defendant Park beneficially owned 10,895 shares of Digimarc common stock, worth roughly $161,682.

24.    Defendant Milena Alberti-Perez ("Alberti-Perez") served as a member of the Board from February 2022 until September 28, 2024. According to the Company's public filings, Defendant Alberti-Perez received $144,136 in 2024 in compensation from the Company.

*Officer Defendant*

25.    Defendant Charles Beck ("Beck") has served as Digimarc's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer since November 2013. According to the Company's public filings, Defendant Beck received $970,050 in 2024 in compensation from the Company. Defendant Beck is named as a defendant in the Securities Class Action. As of March 12, 2025, Defendant Beck beneficially owned 61,775 shares of Digimarc common stock, worth roughly $916,741.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

26.    By reason of their positions as officers and/or directors of Digimarc, and because of their ability to control the business and corporate affairs of Digimarc, the Individual Defendants owed Digimarc and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage

Digimarc in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Digimarc and its shareholders.

27.    Each director and officer of the Company owes to Digimarc and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

28.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Digimarc, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.    To discharge their duties, the officers and directors of Digimarc were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

30.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Digimarc, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

31.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to: ensure that Digimarc implemented and

properly monitored the Company's internal controls over financial reporting; prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

32.    To discharge their duties, the officers and directors of Digimarc were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Digimarc were required to, among other things:

a)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Oregon, the United States, and pursuant to the Digimarc's own Code of Business Conduct (the "Code of Conduct") and internal guidelines;

b)    Conduct the affairs of the Company in an efficient, businesslike manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)    Remain informed as to how Digimarc conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make a reasonable inquiry and to take steps to correct such conditions or practices;

Page 9 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**
4130788

d)      Establish and maintain systematic, accurate records and reports of the business and internal affairs of Digimarc and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause an independent investigation to be made of, said reports and records;

e)      Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Digimarc's operations would comply with all laws and Digimarc's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

f)      Exercise reasonable control and supervision over the Company's officers and employee's public statements and any other reports or information that the Company was required by law to disseminate;

g)      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

h)      Examine and evaluate any reports of examinations, audits, or additional financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

33.      Each of the Individual Defendants further owed to Digimarc and the shareholders the duty of loyalty requiring that each favor Digimarc's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

34.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Digimarc and were at all times acting within the course and scope of such agency.

35.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Digimarc.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

37.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of the law, including breaches of fiduciary duty and unjust enrichment.

38.     The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

39.     To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, each of the Individual Defendants, being directors of Digimarc, was a direct, essential, and significant participant in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

40.    Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of their overall role in furthering the misconduct.

41.    At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Digimarc, and at all times operated within the course and scope of that agency.

## DIGIMARC'S CODE OF CONDUCT

42.    Digimarc's Code of Ethics applies to "every officer, director, employee, consultant and worker of the Company," and violations of the Code of Conduct will lead to "disciplinary measures," including "counseling, warnings, oral or written reprimands, probation, reductions in compensation or suspension without pay, demotions, suspension, termination of employment or service, and restitution."

43.    The Code of Conduct states that its purpose is to:

Deter wrongdoing and to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional interests and relationships;

- Avoidance of self-dealing, related party transactions, taking of a corporate opportunity, or other wrongful acts;

- Disclosure to an appropriate person identified by the Code of any material transaction or relationship that reasonably could be expected to give rise to a conflict of interest;

- Preparation of full, fair, accurate, timely, complete, and understandable disclosures in reports and documents that the Company files with, or

submits to, the SEC, and other public communications made by the
Company;

- Compliance with applicable laws, rules, regulations, or other legal
  authorities;

- Prompt internal reporting to an appropriate person or persons, identified
  by the Code, of violations of the Code's provisions; and

- Accountability for adherence to the Code.

44.     The Code of Conduct begins with a commitment to "high standards of legal and

ethical conduct for the Company and its employees."

45.     With respect to Digimarc's corporate records, the Code of Conduct states, in

pertinent part:

The Company relies on its business records for making business decisions, for
making representations to the government, investors, and the media concerning
the Company, and for asserting its legal rights. It is critical that these records be
accurate and complete and that they be maintained and disposed of in accordance
with applicable professional standards and Company data and record retention
policies. Records covered by this policy include, but are not limited to, expense
reports, timecards, test data, inventory records, accounts payable & receivable,
expense allocations, and project reports. It is your responsibility to see to it that
any Company records generated by you satisfy this high standard and any records
in your custody or control are maintained strictly in accordance with published
Company document retention policies. For additional information, see the Data
and Document Retention Policy and the Code of Ethics for Financial Personnel.
In addition, the Company prohibits its employees from destroying, altering, or
falsifying Company records when such acts are intended to impede or obstruct the
investigation of any governmental or regulatory entity.

It is of critical importance that the Company's public filings, communications and
disclosures be full, fair, accurate, timely, and understandable. Each employee is
responsible for ensuring full, fair, accurate, timely, and understandable
disclosures in reports and documents that the Company files with, or submits to,
the SEC and in other public communications made by the Company.

46.     With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

The Company recognizes and respects that employees may take part in legitimate
financial, business, and other activities outside of their positions with the
Company. However, conflicts between the interests of Company employees and

Page 13 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

the Company are prohibited. A conflict of interest exists when a person engages in an activity that could prevent the person from fully and impartially discharging their duties and responsibilities to the Company. While a complete definition of what constitutes a conflict of interest is difficult, there are some situations that will always be considered a prohibited conflict of interest, and others that simply raise the possibility of a conflict. Examples and additional information is provided in the Policy Statement on Conflicts of Interest.

It is your responsibility to avoid any conflict between your personal interests and the interests of Digimarc.

47.     The Company maintains a separate "Code of Ethics for all Financial Personnel of Digimarc Corporation" (the "Code of Ethics for Financial Personnel"). In a section titled "Internal Accounting Controls and Procedures," the Code of Ethics for Financial Personnel states:

The Company maintains a system of internal accounting controls designed to ensure the reliability, adequacy, and integrity of its financial books and records and financial statements. To satisfy these requirements, the Company has adopted policies to ensure that only proper transactions are entered into by the Company, that such transactions have proper management approval, that such transactions are properly accounted for in the books and records of the Company, and that the reports and financial statements of the Company fairly and accurately reflect such transactions. The Company also has adopted a system of disclosure controls to assure that all important information regarding the business and prospects of the Company is gathered and reported in accordance with applicable law. Both corporate management and outside auditors must certify the adequacy of internal accounting controls and procedures.

All employees having any responsibility for such functions must be familiar with the Company's policies, accounting controls, and procedures, and Company books and records must comply with their requirements. The following guiding principles apply to assist in the implementation of these requirements:

- Each employee shall strictly adhere to the system of internal accounting controls and disclosure controls, including all of the internal reporting responsibilities assigned to him or her by the Company.

- Each employee shall promptly report to their supervisor, in accordance with Company policy, any significant event or occurrence (whether positive or negative) that arises in the course of the employee's duties and responsibilities, including those that affect the Company and its business

Page 14 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

associates, competitors, or industries (general economic conditions need not be reported).

- Each employee must be candid in discussing matters concerning internal controls and business disclosures with the Company's management, outside auditors, and outside counsel.

- Employees shall promptly report to the Chief Financial Officer and the Chief Legal Officer any actual or suspected breaches or violations of the Company's internal controls, or any actual or suspected fraudulent or questionable activities, that come to their attention.

The Company will continuously evaluate its internal accounting controls, procedures, and records to ensure compliance with the requirements imposed by law and this Code. Such evaluation will be documented in a form suitable for inspection by outside parties, such as regulatory authorities, if the need arises. The Company will take action to remedy any deficiency in internal accounting controls, procedures, and records to ensure continuing compliance with the requirements imposed by law and this Code.

48.    In a section titled "Periodic Reporting to the SEC," the Code of Ethics for

Financial Personnel states:

The Company's senior financial officers, including, but not limited to, its Chief Financial Officer and Corporate Controller, are responsible for disclosing all information that must be disclosed in any periodic report required by securities laws, rules, and regulations, such as Forms 10-Q, 10-K, and 8-K. At all times, such disclosures shall be full, fair, accurate, timely, and understandable.

The Company's Chief Executive Officer and Chief Financial Officer must personally make certain representations in accordance with securities laws, rules, and regulations relating to the Company's quarterly and annual reports. In order to assist the Chief Executive Officer and Chief Financial Officer in compliance with their obligations, each Company employee who is the head of a department (a "department head") must personally attest each quarter that the financial report or records relating to their area are accurate and fair, and that they properly reflect the Company's business transactions and financial position. Specifically, each department head must certify the following:

- That the department head has reviewed the department's financial report;

- That, based on the department head's knowledge, the department's financial report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein (in light of the circumstances under which the statements were made) not misleading; and

- That, based on the department head's knowledge, the financial report fairly presents in all material respects the financial condition and results of operations of the department for the period in question.

In addition, each department head must disclose to the Chief Financial Officer whether they are aware of any material weaknesses or significant deficiencies in the design or operation of such internal controls that could adversely affect the Company's ability to timely record, process, summarize, and report financial information for the department. Each department head also must disclose to the Chief Financial Officer and to the Chief Legal Officer any fraud, loyalty, ethics, or business conduct concern, whether or not material, that involves any Company employees or agents.

## DIGIMARC'S AUDIT COMMITTEE CHARTER

49.     Digimarc's Audit Committee Charter states the following with respect to the

purposes of the Audit Committee:

The Audit Committee . . . is responsible for overseeing the quality and integrity of the accounting, auditing, and financial reporting practices of the Company, the audits of the financial statements of the Company, and such other duties as directed by the Board. The Committee's role includes a particular focus on the qualitative aspects of financial reporting to stockholders, on the Company's processes to manage business and financial risk, and on compliance with significant applicable legal, ethical, and regulatory requirements. The Committee is directly responsible for the appointment, compensation, retention and oversight of the public accounting firm (including resolution of disagreements between management and the auditor regarding financial reporting) engaged to prepare or issue an audit report on the financial statements of the Company or perform other audit, review or attest services for the Company. The Committee is also responsible for oversight of cybersecurity and enterprise risk management and any such other duties delegated by the Board.

50.     With respect to the Company's risk management function, the Audit Committee

Charter states:

The Committee will inquire of Finance management, the General Counsel, and the public accounting firm about significant financial risks or exposures and

Page 16 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

assess the steps management has taken to minimize such risks and exposures to the Company, and the Committee will also inquire of Finance management, the General Counsel, and the public accounting firm about the effect or potential effect of any regulatory regime, accounting initiatives or off-balance sheet structures on the Company's financial statements.

51.     With respect to the Company's internal controls, the Audit Committee Charter states:

> The Committee will consider and review with the public accounting firm, Financial management and the General Counsel:
>
>> a.  The adequacy of the Company's internal controls including computerized information system controls and security, as well as management's assessment of the effectiveness of internal control over financial reporting and the related auditor's attestation report.
>>
>> b.  Any related significant findings and recommendations of the public accounting firm and internal audit together with management's responses thereto.

52.     The Audit Committee Charter states that the Audit Committee shall "review with Finance management and the public accounting firm . . . The Company's annual financial statements and related footnotes."

53.     The Audit Committee Charter further states:

> The Committee will review filings (including interim reporting) with the SEC and other published documents containing the Company's financial statements and consider whether the information contained in these documents is consistent with the information contained in the financial statements before it is filed with the SEC or other regulators.

54.     With respect to the Company's earnings releases, the Audit Committee Charter states that the Audit Committee shall "review the Company's earnings release script each quarter prior to public distribution."

Page 17 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

## SUBSTANTIVE ALLEGATIONS

*Background*

55.     Digimarc is a technology company that specializes in digital watermarking and data identification solutions. The Company's technology has applications in product packaging, inventory tracking, anti-counterfeiting, and retail. For example, products containing the Company's watermarks can be scanned using smartphones or point-of-sale systems to streamline checkout, inventory management, and product authentication.

56.     Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) one of the Company's major commercial partners would not renew a significant contract under its existing terms; (ii) consequently, the Company was forced to renegotiate the terms of the contract, leading to a substantial reduction in Digimarc's subscription revenue and annual recurring revenue; and (iii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

*Materially False and Misleading Statements*

57.     On May 3, 2024, Digimarc issued a press release, reporting its first quarter 2024 financial results. The press release stated, in pertinent part:

> "Q1 was another strong quarter for Digimarc. ***Compared to the first quarter of 2023, we grew quarter-ending Annual Recurring Revenue (ARR) 85%,*** grew commercial subscription revenue 52%, and expanded subscription gross profit margin 7.5 percentage points to 87.0%," said Digimarc CEO Riley McCormack.
>
> First Quarter Financial Results

Page 18 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

Subscription revenue for the first quarter of 2024 increased to $5.8 million compared to $3.9 million for the first quarter of 2023, primarily reflecting *higher subscription revenue from new and existing commercial contracts.*[2]

58.     The same day, Digimarc filed a quarterly report on Form 10-Q with the SEC for the first quarter of 2024. Therein, the Company reported that "ARR increased to $10.9 million, or 85% from March 31, 2023 to March 31, 2024, *primarily driven by the entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts*."

59.     On August 13, 2024, the Company issued a press release, reporting its second quarter 2024 financial results. The press release stated, in pertinent part:

> "Digimarc made significant progress on multiple fronts in Q2, highlighted by three exciting developments likely to have a profound impact on the second half of this year and beyond," said Digimarc CEO Riley McCormack. "This progress provides further evidence that we believe Digimarc will not only unlock the massive total addressable markets ("TAMs") on which we are focused today, but also that new TAMs can develop incredibly rapidly based on our ability to identify and authenticate physical and digital assets where other means of identification and authentication don't work well, or don't work at all."

> Second Quarter Financial Results
> *Annual recurring revenue as of June 30, 2024 increased to $23.9 million compared to $16.7 million as of June 30, 2023.*

> Subscription revenue for the second quarter of 2024 increased to $6.4 million compared to $4.7 million for the second quarter of 2023, primarily reflecting higher subscription revenue from new and existing commercial contracts.

60.     The same day, Digimarc filed a quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q24 10-Q"), affirming its previously reporting financial results and reporting that "ARR increased $7.3 million, or 44% from June 30, 20203 to June 30, 2024, primarily driven by the entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts." The 2Q24 10-Q further stated:

---

[2] Unless indicated otherwise, all emphasis is added.

Subscription

Subscription revenue consists primarily of revenue earned from subscription fees for access to our SaaS platform and products and, to a lesser extent, licensing fees for our software products. The majority of subscription contracts are recurring, paid in advance and recognized over the term of the subscription, which is typically one to three years.

The $0.4 million increase in subscription revenue for the three month period ended September 30, 2024, compared to the corresponding three month period ended September 30, 2023, primarily reflects higher subscription revenue from new and existing commercial contracts, partially offset by the delayed timing in the anticipated renewal of a commercial contract.

The $4.0 million increase in subscription revenue for the nine month period ended September 30, 2024, compared to the corresponding nine month period ended September 30, 2023, primarily reflects higher subscription revenue from new and existing commercial contracts, partially offset by the delayed timing in the anticipated renewal of a commercial contract.

61.    On November 14, 2024, the Company issued a press release, reporting its third quarter 2024 financial results. The press release stated, in pertinent part:

Third Quarter Financial Results Annual recurring revenue as of September 30, 2024 decreased to $18.7 million compared to $19.6 million as of September 30, 2023. ***The $0.9 million decrease reflects a $5.8 million decrease due to the delayed timing in the anticipated renewal of a commercial contract***, partially offset by new annual recurring revenue from entry into new commercial subscription contracts and increased subscription fees on existing commercial contracts.

Subscription revenue for the third quarter of 2024 increased to $5.3 million compared to $4.8 million for the third quarter of 2023, primarily reflecting higher subscription revenue from new and existing commercial contracts, ***partially offset by the delayed timing in the anticipated renewal of a commercial contract***.

62.    The same day, the Company filed a quarterly report on Form 10-Q with the SEC for the third quarter of 2024. Therein, the Company reported that "ARR decreased $0.9 million, or 5% from September 30, 2023 to September 30, 2024, reflecting a ***$5.8 million decrease due to the delayed timing in the anticipated renewal of a commercial contract***."

Page 20 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

63.    The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) one of the Company's major commercial partners would not renew a significant contract under its existing terms; (ii) consequently, the Company was forced to renegotiate the terms of the contract, leading to a substantial reduction in Digimarc's subscription revenue and annual recurring revenue; and (iii) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

64.    On February 26, 2025, the Company issued a press release, reporting its fourth quarter and full year 2024 financial results. Digimarc reported $5.0 million in quarterly subscription revenue, a 10% decline year-over-year. The Company further reported $20.0 million in annual recurring revenue, down from $22.3 million during the prior year. The Company attributed its disappointing financial results to a "$5.8 million decrease in ARR ***due to the expiration of a commercial contract in June 2024.***" Specifically, the press release stated, in pertinent part:

Fourth Quarter 2024 Financial Results

Annual recurring revenue (ARR1) as of December 31, 2024 decreased to $20.0 million compared to $22.3 million as of December 31, 2023. The $2.3 million decrease primarily reflects a $5.8 million decrease in ARR due to the expiration of a commercial contract in June 2024, partially offset by an increase in ARR from new and existing commercial contracts.

Subscription revenue for the fourth quarter of 2024 decreased to $5.0 million compared to $5.6 million for the fourth quarter of 2023, primarily reflecting the expiration of a commercial contract in June 2024, partially offset by higher subscription revenue from new and existing commercial contracts.

65.     On this news, the price of Digimarc stock declined 43.1% in one day, from a close of $27.01 per share on February 26, 2025 to a close of $15.39 per share on February 27, 2025.

***Stock Repurchases During the Relevant Period***

66.     According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase 106,611 shares of its own stock, for a total of roughly $3.18 million, between May 2024 and February 2025.

67.     Given that the price of Digimarc stock was $15.39 after the corrective disclosures on February 27, 2025, the true value of the 106,611 repurchased shares was roughly $1.64 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $1.54 million to repurchase these shares.

## DAMAGE TO DIGIMARC

68.     As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

69.     These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their fiduciary duties to Digimarc, and costs incurred as a result of Company management causing the Company to overpay to repurchase shares of common stock.

70.     Furthermore, as a direct and proximate result of the misconduct detailed herein, Digimarc has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

72.     Digimarc is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

73.     Plaintiff is a current shareholder of Digimarc and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

74.     A pre-suit demand on the Board of Digimarc is futile and, therefore, excused. At the time this action was commenced, the eight-member Board was comprised of Defendants Anderson-Williams, Cheston, Dadlani, Kool, McCormack, Mcilwain, and Park (the "Director Defendants"), along with Rishi Bajaj, who joined the Board after the Relevant Period and is not a party to this action. Accordingly, Plaintiff is only required to show that four directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, at least seven of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability,

and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

75.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

76.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

77.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

78.     Defendant McCormack is not disinterested or independent and is therefore incapable of considering a demand. Defendant McCormack has served as the Company's President CEO since April 2021. Accordingly, the Company admits that Defendant McCormack has a relationship that would materially interfere with his independent judgment and is not independent pursuant to the standards set forth by NASDAQ. Further, Defendant McCormack is named as a defendant and faces significant personal liability in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

79.     Defendants Mcilwain, Cheston, Dadlani, and Kool served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the

Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

80.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and, therefore, demand upon them is futile.

81.     All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein.

Page 25 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

82.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

83.     The acts complained of herein constitute violations of fiduciary duties owed by Digimarc's officers and directors, and these acts are incapable of ratification.

84.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Digimarc. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Digimarc, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

Page 26 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

85.     If there is no directors' and officers' liability insurance, then the directors will not cause Digimarc to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

86.     Thus, for all of the reasons set forth above, at least seven of Digimarc's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

87.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

88.     The Individual Defendants participated in a scheme with the purpose and effect of defrauding Digimarc. Not only is Digimarc now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Digimarc by the Individual Defendants.

89.     During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $1.54 million to repurchase roughly 106,611 shares.

90.     The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

91.     The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices

and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Digimarc not misleading.

92.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Digimarc.

93.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

94.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duties

95.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Page 28 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

96.     The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

97.     The Individual Defendants violated and breached their fiduciary duties of care, loyalty, and good faith.

98.     The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

100.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

Page 29 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

## COUNT III

### Against the Individual Defendants
### For Aiding and Abetting Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

102.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

103.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants
### For Unjust Enrichment

104.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

105.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Digimarc.

106.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Digimarc that were

tied to the performance or artificially inflated valuation of Digimarc, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

107.    Plaintiff, as a shareholder and representative of Digimarc, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

108.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### Against the Individual Defendants

109.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

110.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Digimarc to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

111.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

112.    Plaintiff, on behalf of Digimarc, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

4130788

a)     Declaring that the Plaintiff may maintain this action on behalf of Digimarc and that Plaintiff is an adequate representative of the Company;

b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Digimarc;

c)     Determining and awarding to Digimarc the damages sustained, or disgorgement or restitution, by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)     Directing Digimarc to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Digimarc and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

e)     Awarding punitive damages;

f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

g)     Granting such other and further relief as the Court may deem just and proper.

Page 32 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED this 7th day of October, 2025.

BLACK HELTERLINE LLP


By:_____s/ Michael B. Merchant_____
     Michael B. Merchant
     OSB No. 882680
     (503) 224-5560

*Liaison Counsel for Plaintiff*


**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
tjm@rl-legal.com
sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone:  (267) 507-6085
Email: jgrabar@grabarlaw.com

*Counsel for Plaintiff*


Page 33 – **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

4130788